# SUPREME COURT OF THE UNITED STATES

DENVER A. YOUNGBLOOD, JR. *v.* WEST VIRGINIA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF APPEALS OF WEST VIRGINIA

No. 05–6997.    Decided June 19, 2006

PER CURIAM.

In April 2001, the State of West Virginia indicted petitioner Denver A. Youngblood, Jr., on charges including abduction of three young women, Katara, Kimberly, and Wendy, and two instances of sexual assault upon Katara. The cases went to trial in 2003 in the Circuit Court of Morgan County, where a jury convicted Youngblood of two counts of sexual assault, two counts of brandishing a firearm, and one count of indecent exposure. The conviction rested principally on the testimony of the three women that they were held captive by Youngblood and a friend of his, statements by Katara that she was forced at gunpoint to perform oral sex on Youngblood, and evidence consistent with a claim by Katara about disposal of certain physical evidence of their sexual encounter. Youngblood was sentenced to a combined term of 26 to 60 years' imprisonment, with 25 to 60 of those years directly attributable to the sexual-assault convictions.

Several months after being sentenced, Youngblood moved to set aside the verdict. He claimed that an investigator working on his case had uncovered new and exculpatory evidence, in the form of a graphically explicit note that both squarely contradicted the State's account of the incidents and directly supported Youngblood's consensual-sex defense. The note, apparently written by Kimberly and Wendy, taunted Youngblood and his friend for having been "played" for fools, warned them that the girls had vandalized the house where Youngblood brought them, and mockingly thanked Youngblood for performing oral

sex on Katara.  The note was said to have been shown to a state trooper investigating the sexual-assault allegations against Youngblood; the trooper allegedly read the note but declined to take possession of it, and told the person who produced it to destroy it.  Youngblood argued that the suppression of this evidence violated the State's federal constitutional obligation to disclose evidence favorable to the defense, and in support of his argument he referred to cases citing and applying *Brady* v. *Maryland,* 373 U. S. 83 (1963).

The trial court denied Youngblood a new trial, saying that the note provided only impeachment, but not exculpatory, evidence.  The trial court did not discuss *Brady* or its scope, but expressed the view that the investigating trooper had attached no importance to the note, and because he had failed to give it to the prosecutor the State could not now be faulted for failing to share it with Youngblood's counsel.  See App. C to Pet. for Cert. (Tr. 22–23 (Sept. 25, 2003)).

A bare majority of the Supreme Court of Appeals of West Virginia affirmed, finding no abuse of discretion on the part of the trial court, but without examining the specific constitutional claims associated with the alleged suppression of favorable evidence.  217 W. Va. 535, 548, 618 S. E. 2d 544, 557 (2005) *(per curiam).*  Justice Davis, dissenting in an opinion that Justice Starcher joined, unambiguously characterized the trooper's instruction to discard the new evidence as a *Brady* violation.  *Id.,* at 550–552, 618 S. E. 2d, at 559–561.  The dissenters concluded that the note indicating that Youngblood engaged in consensual sex with Katara had been suppressed and was material, *id.,* at 550, n. 6, 618 S. E. 2d, at 559, n. 6 (citing *Kyles* v. *Whitley,* 514 U. S. 419, 435, 437–438 (1995)), both because it was at odds with the testimony provided by the State's three chief witnesses (Katara, Kimberly, and Wendy) and also because it was entirely consistent with

Youngblood's defense at trial that his sexual encounters with Katara were consensual, 217 W. Va., at 551–552, 618 S. E. 2d, at 560–561. Youngblood then filed this petition for a writ of certiorari.

A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. See 373 U. S., at 87. This Court has held that the *Brady* duty extends to impeachment evidence as well as exculpatory evidence, *United States* v. *Bagley,* 473 U. S. 667, 676 (1985), and *Brady* suppression occurs when the government fails to turn over even evidence that is "known only to police investigators and not to the prosecutor," *Kyles*, 514 U. S., at 438. See *id.,* at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" *Strickler* v. *Greene,* 527 U. S. 263, 280 (1999) (quoting *Bagley, supra*, at 682 (opinion of Blackmun, J.)), although a "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," *Kyles*, 514 U. S., at 434. The reversal of a conviction is required upon a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.,* at 435.

Youngblood clearly presented a federal constitutional *Brady* claim to the State Supreme Court, see Brief for Appellant in No. 31765 (Sup. Ct. App. W. Va.), pp. 42–47, as he had to the trial court, see App. C to Pet. for Cert. (Tr. 6, 44–45, 50, 51 (Sept. 25, 2003)); *id.*, at 13, 17 (Sept. 29, 2003). And, as noted, the dissenting justices discerned the significance of the issue raised. If this Court is to reach the merits of this case, it would be better to have the

Per Curiam

benefit of the views of the full Supreme Court of Appeals of West Virginia on the *Brady* issue. We, therefore, grant the petition for certiorari, vacate the judgment of the State Supreme Court, and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

### DENVER A. YOUNGBLOOD, JR. *v.* WEST VIRGINIA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF APPEALS OF WEST VIRGINIA

No. 05–6997.   Decided June 19, 2006

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

In *Lawrence* v. *Chater*, 516 U. S. 163 (1996) *(per curiam),* we greatly expanded our "no-fault V & R practice" (GVR) beyond its traditional bounds. *Id.*, at 179 (SCALIA, J., dissenting). At the time, I remarked that "[t]he power to 'revise and correct' for error has become a power to void for suspicion" of error, *id.*, at 190 (quoting *Marbury* v. *Madison*, 1 Cranch 137, 175 (1803); alterations omitted). And I predicted that "'GVR'd for clarification of \_\_\_\_'" would "become a common form of order, drastically altering the role of this Court." 516 U. S., at 185. Today, by vacating the judgment of a state court simply because "[i]f this Court is to reach the merits of this case, it would be better to have the benefit of the views of the full Supreme Court of Appeals of West Virginia on the *Brady* issue," *ante*, at 3–4, the Court brings this prediction to fulfillment.

In *Lawrence*, I identified three narrow circumstances in which this Court could, consistent with the traditional understanding of our appellate jurisdiction (or at least consistent with entrenched practice), justify vacating a lower court's judgment *without first identifying error:* "(1) where an intervening factor has arisen [*e.g.,* new legislation or a recent judgment of this Court] that has a legal bearing upon the decision, (2) where, in a context not governed by *Michigan* v. *Long*, 463 U. S. 1032 (1983), clarification of the opinion below is needed to assure our jurisdiction, and (3) (in acknowledgment of established

practice, though not necessarily in agreement with its validity) where the respondent or appellee confesses error in the judgment below." 516 U. S., at 191–192 (dissenting opinion). Needless to say, today's novel GVR order falls into none of these categories. There has been no intervening change in law that might bear upon the judgment. Our jurisdiction is not in doubt, see *ante*, at 3; *State* v. *Frazier*, 162 W. Va. 935, 942, n. 5, 253 S. E. 2d 534, 538, n. 5 (1979) (petitioner's *Brady* claim was properly presented in his motion for a new trial). And the State has confessed no error—not even on the broadest and least supportable theory of what constitutes an error justifying vacatur. See, *e.g., Alvarado* v. *United States*, 497 U. S. 543, 545 (1990) (Rehnquist, C. J., dissenting) (vacating when the Solicitor General confessed error in the lower court's "'analysis,'" but not its judgment); *Stutson* v. *United States*, 516 U. S. 193 (1996) *(per curiam)* (vacating when the Solicitor General confessed error in a position taken before the Court of Appeals, on which the court *might* have relied; discussed in *Lawrence, supra*, at 184–185 (SCALIA, J., dissenting)); *Department of Interior* v. *South Dakota*, 519 U. S. 919, 921 (1996) (SCALIA, J., dissenting) (vacating when "the Government, having *lost* below, wishes to try out a new legal position"). Here, the Court vacates and remands *in light of nothing*.

Instead, the Court remarks tersely that it would be "better" to have "the benefit" of the West Virginia court's views on petitioner's *Brady* claim, should we eventually decide to take the case. *Ante*, at 3–4. The Court thus purports to conscript the judges of the Supreme Court of Appeals of West Virginia to write what is essentially an *amicus* brief on the merits of an issue they have already decided, in order to facilitate our *possible* review of the merits at some later time. It is not at all clear why it would be so much "better" to have the full court below address the *Brady* claim. True, we often prefer to review

reasoned opinions that facilitate our consideration—though we *may* review even a summary disposition. See *Lawrence, supra*, at 186 (SCALIA, J., dissenting). But the dissenting judges in the case below discussed petitioner's *Brady* claim at some length (indeed, at greater length than appears in many of the decisions we agree to review), and argued that it was meritorious. See 217 W. Va. 535, 549–552, 618 S. E. 2d 544, 558–561 (2005) (Davis, J., joined by Starcher, J., dissenting). Since we sometimes review judgments with no opinion, and often review judgments with opinion only on one side of the issue, it is not clear why we need opinions on *both* sides here.

To tell the truth, there is only one obvious sense in which it might be "better" to have the West Virginia court revisit the *Brady* issue: If the majority suspects that the court below erred, there is a chance that the GVR-in-light-of-nothing will induce it to change its mind on remand, sparing us the trouble of correcting the suspected error. It is noteworthy that, to justify its GVR order, the Court does not invoke even the flabby standard adopted in *Lawrence*, namely whether there is "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration," 516 U. S., at 167. That is because (there being no relevant intervening event to create such a probability) the only *possibility* that the West Virginia court will alter its considered judgment *is created by this Court's GVR order itself*. A case such as this, which meets none of the usual, outcome-neutral criteria for granting certiorari set forth in this Court's Rules 10(a)–(c), could attract our notice only if we suspected that the judgment appealed from was in error. Those whose judgments we review have sometimes viewed even our legitimate, intervening-event GVR orders as polite directives that they reverse themselves. See, *e.g.*, *Sharpe* v. *United States*, 712 F. 2d 65, 67 (CA4 1983) (Russell, J., dissenting) ("Once again, I

think the majority has mistaken gentleness in instruction for indefiniteness in command. The Supreme Court was seeking to be gentle with us but there is, I submit, no mistaking what they expected us to do"). How much more is that suspicion justified when the GVR order rests on nothing more than our statement that it would be "better" for the lower court to reconsider its decision (much as a mob enforcer might suggest that it would be "better" to make protection payments).

Even when we suspect error, we may have many reasons not to grant certiorari outright in a case such as this—an overcrowded docket, a reluctance to correct "the misapplication of a properly stated rule of law," this Court's Rule 10, or (in this particular case) even a neo-Victorian desire to keep the lurid phrases of the "graphically explicit note," *ante*, at 1, out of the U. S. Reports. But none of these reasons justifies "a tutelary remand, as to a schoolboy made to do his homework again." *Lawrence*, 516 U. S., at 185–186 (SCALIA, J., dissenting). In "the nature of the appellate system created by the Constitution and laws of the United States," *id.*, at 178, state courts and lower federal courts are constitutionally distinct tribunals, independently authorized to decide issues of federal law. They are not, as we treat them today, "the creatures and agents of this body," *id.*, at 178–179. If we suspect that a lower court has erred and wish to correct its error, we should grant certiorari and decide the issue ourselves in accordance with the traditional exercise of our appellate jurisdiction.

It is particularly ironic that the Court inaugurates its "GVR-in-light-of-nothing" practice by vacating the judgment of a *state* court. Our no-fault GVR practice had its origins "in situations calling forth the special deference owed to state law and state courts in our system of federalism." *Id.*, at 179. We first used it to allow the state court to decide the effect of an intervening change in state

law. *Ibid.* (citing *Missouri ex rel. Wabash R. Co.* v. *Public Serv. Comm'n*, 273 U. S. 126 (1927)). Likewise, our other legitimate category of no-fault GVR—to ensure our own jurisdiction—"originate[d] in the special needs of federalism." *Lawrence,* 516 U. S., at 181. In vacating the judgment of a state court for no better reason than our own convenience, we not only fail to observe, but positively flout the "special deference owed to . . . state courts," *id.*, at 179. Like the Ouroboros swallowing its tail, our GVR practice has ingested its own original justification.

Chief Justice Marshall wrote in *Marbury* v. *Madison* that "[i]t is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted . . . ." 1 Cranch, at 175. At best, today's unprecedented decision rests on a finding that the state court's "opinion, though arguably correct, [is] incomplete and unworkmanlike," *Lawrence*, 516 U. S., at 189 (SCALIA, J., dissenting)—which all Members of the Court in *Lawrence* agreed was an illegitimate basis for a GVR, see *id.*, at 173 *(per curiam)*. At worst, it is an implied threat to the lower court, not backed by a judgment of our own, that it had "better" reconsider its holding.

I suppose it would be available to the West Virginia Supreme Court of Appeals, on remand, simply to reaffirm its judgment without further elaboration. Or it could instead enter into a full discussion of the *Brady* issue, producing either a reaffirmance or a revision of its judgment. The latter course will of course encourage and stimulate our new "GVR-in-light-of-nothing" jurisprudence. *Verb. sap.*

For these reasons, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

### DENVER A. YOUNGBLOOD, JR. *v.* WEST VIRGINIA

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

No. 05–6997. Decided June 19, 2006

JUSTICE KENNEDY, dissenting.

The Court's order to grant, vacate, and remand (GVR) in *Lawrence* v. *Chater,* 516 U. S. 163 (1996) *(per curiam)*, had my assent. In that case there was a new administrative interpretation that the Court of Appeals did not have an opportunity to consider. *Id.,* at 174. The Court today extends the GVR procedure well beyond *Lawrence* and the traditional practice of issuing a GVR order in light of some new development. See *id.,* at 166–167. Since the issuance of a GVR order simply for further explanation is, as JUSTICE SCALIA explains, see *ante*, p. ___, both improper and contrary to our precedents, I respectfully dissent.